UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JAMES CARLTON NIX, III, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) Case Number: 5:18-cv-01098-AKK |
| | ) |
| PNC BANK, N.A., | ) |
| | ) |
| Appellee. | ) |

**MEMORANDUM OPINION**

James Carlton Nix, III appeals from the bankruptcy court's July 6, 2018 order finding that the debt he owed to PNC Bank, N.A. is non-dischargeable under 11 U.S.C. § 523(a)(6). Doc. 1. Nix contends that the bankruptcy court erred by finding that he caused a willful and malicious injury to PNC, and he argues that he is entitled to a new trial because there is no transcript of the proceedings before the bankruptcy court. The appeal is fully briefed, docs. 5, 6, 7, as is PNC's motion to strike Nix's reply brief for raising arguments that Nix did not present in his initial brief, docs. 8 and 9. For the reasons explained below, the court finds that the bankruptcy court's order is due to be affirmed, and PNC's motion to strike is moot.

**I.  STANDARD OF REVIEW**

The district court sits as an appellate court in reviewing final decisions of a bankruptcy court. 28 U.S.C. § 158(a)(1). Accordingly, the district court reviews

the bankruptcy court's findings of fact under the clearly erroneous standard, while the bankruptcy court's legal conclusions are subject to de novo review. *See, e.g. Educ. Credit Mgm't Corp. v. Mosley*, 494 F.3d 1320, 1324 (11th Cir. 2007). *See also* Fed. R. Bankr. P. 7052 (incorporating Fed. R. Civ. P. 52); Fed. R. Bankr. P. 8013. "The factual findings of the bankruptcy court are not clearly erroneous unless, in the light of all the evidence, '[the district court is] left with the definite and firm conviction that a mistake has been made.'" *In re TOUSA, Inc.*, 680 F.3d 1298, 1310 (11th Cir. 2012) (citations omitted). In addition, because "[a]ssessing witness credibility is uniquely the function of the trier of fact," *United States v. Peters*, 403 F.3d 1263, 1270 (11th Cir. 2005), "generally [the court] will not disturb a bankruptcy court's credibility determinations," *In re Kane*, 755 F.3d 1285, 1288 (11th Cir. 2014) (citing *In re Englander*, 95 F.3d 1028, 1039 (11th Cir. 1996)).

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

On September 14, 2006, Nix borrowed $75,000 from First American Bank, PNC's predecessor-in-interest, to purchase five membership units in Crestwood Healthcare, LP ("Crestwood"). Docs. 3-12 at 2; 3-11 at 8. The loan required quarterly interest payments and matured on October 14, 2016. Docs. 3-12 at 2; 3-11 at 8. To secure the loan, Nix signed a Pledge and Security Agreement, which pledged his interest in the membership units and any proceeds therefrom to PNC as

2

collateral for the loan. Docs. 3-12 at 2; 3-13 at 1, 17-18. Nix also purchased five additional membership units with a loan from Wells Fargo. Doc. 3-12 at 2.

Nix tried unsuccessfully to sell the membership units back to Crestwood in 2007. Doc. 3-12 at 4. Then, in December 2009, Nix sold four membership units to Crestwood Hospital, LLC (the "Hospital").[1] *Id.* at 3. Nix sold two more membership units to Crestwood in November 2011, and sold an additional two units to them in November 2012. *Id.* Finally, Nix sold his last two membership units to the Hospital in September 2015. *Id.* Nix received a total of $185,744 in proceeds from the sale of his ten membership units, which he used to pay other debts. *Id.* at 3-4. Nix never informed PNC about the sale of the membership units. *Id.* at 4.

Nix also did not inform Crestwood and the Hospital that he had pledged five units to PNC. Doc. 3-12 at 4. Rather, in connection with his 2011 and 2012 sales to Crestwood, Nix signed documents representing that his membership units were "free and clear of all liens, security interests and encumbrances whatsoever . . . ." Doc. 3-11 at 12-13. And, in connection with his sales of membership units to the Hospital in 2009 and 2015, Nix signed "Letters of Transmittal" in which he represented that he had "not conveyed, assigned, transferred or pledged any direct or indirect interest [in the units] to any other person or entity." Docs. 3-11 at 11; 3-

---

[1] Crestwood Hospital, LLC is an affiliate of Community Health Systems, Inc., the corporate parent of Crestwood Healthcare, LP. Doc. 3-12 at 3.

12 at 4, 14. A representative from the Hospital testified that the Hospital would have informed PNC about the sale of the units if Nix had disclosed PNC's security interest. Doc. 3-12 at 7.

In June 2014, a PNC representative called Nix to inquire about the location of the stock certificates for the five membership units he purchased with the PNC loan. Docs. 3-11 at 15; 3-12 at 7. Nix did not inform the representative that he had sold most of his units and only still owned two units. *Id.* Instead, Nix told the representative that he was not sure about the certificates' whereabouts and would "check with his wife who handles his finances and either go to [the] branch with statements, etc. or get back to [the representative] with what he has." Doc. 3-11 at 15. Nix never called PNC back to provide the requested information. *See id.*

Nix made quarterly interests payments to PNC under the terms of the loan until July 25, 2016. Doc. 3-12 at 3. In total, Nix paid PNC $51,493 in interest and $10,397.21 in principal on the loan, leaving a principal balance of $64,602.79. *Id.* After the loan matured in October 2016, PNC sent Nix a letter, informing him of an "Event of Default" based on non-payment and securitization. *Id.*

Nix subsequently filed for relief under Chapter 7 of the Bankruptcy Code, and listed PNC as an unsecured creditor. Doc. 3-12 at 3. PNC in turn filed an adversary proceeding, seeking a declaration that the debt Nix owed to it is non-dischargeable under 11 U.S.C. § 523(a). Doc. 3-2. Due to a technical error, a

4

transcript for the May 15, 2008 trial of the adversary proceeding is unavailable. Docs. 3-4; 3-10 at 3; 5 at 7 n.1. The bankruptcy court subsequently entered a judgment in favor of PNC, finding that the debt is non-dischargeable under 11 U.S.C. § 523(a)(6), and that Nix's "actions constitute a willful and malicious injury for purposes of § 523(a)(6)." Doc. 3-12 at 16. Nix challenges this finding. Docs. 1, 5.

## II. ANALYSIS

"A Chapter 7 debtor is generally entitled to a discharge of all debts that arose prior to the filing of the bankruptcy petition.'" *In re Kane*, 755 F.3d 1285, 1292 (11th Cir. 2014) (quoting *In re Mitchell*, 633 F.3d 1319, 1326 (11th Cir. 2011)). But, the Bankruptcy Act "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'" *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)). Thus, some debts cannot be discharged, including, as relevant here, a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity . . . ." 11 U.S.C. § 523(a)(6). A creditor bears the burden of proving a debt is non-dischargeable by a preponderance of the evidence, *Grogan v. Garner*, 498 U.S. 279, 291(1991), and courts narrowly construe the exceptions to discharge, *In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994).

For purposes of § 523(a)(6)'s exception to discharge, a willful injury occurs

5

when a debtor "'commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury.'" *In re Kane*, 755 F.3d at 1293 (quoting *In re Jennings*, 670 F.3d 1329, 1334 (11th Cir. 2012)). In other words, a willful injury means "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original). "'Malicious' means without just cause or excessive even in the absence of personal hatred, spite or ill will." *In re Jennings*, 670 F.3d at 1334. "A bankruptcy court's determination that an injury was 'willful and malicious' is a factual finding that [the court] review[s] only for clear error." *In re Kane*, 755 F.3d at 1293 (citations omitted).

### A. Whether the bankruptcy court erred by finding a willful injury

Nix correctly asserts that injuries caused by negligent or even reckless conduct do not qualify as willful injuries under § 523(a)(6). *See Kawaauhau*, 523 U.S. at 64 ("[D]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)."). Nix argues that at most he acted with reckless disregard for the consequences when he sold his membership units without informing PNC and, therefore, the bankruptcy court erred by finding that he caused a willful injury to PNC. Doc. 5 at 12-13, 17. In particular, Nix argues that the evidence at trial proves that he sold the units only "to create much needed cash flow to pay the IRS and to keep his health clinics open," and that there is no

evidence that he "sold the Units with the intended purpose of causing injury to PNC." *Id.* at 11. The court is not persuaded because, as an initial matter, evidence that Nix sold his membership units to create cash flow and pay other debts is not contrary to the bankruptcy court's finding that he acted with the intent to deceive.

Moreover, documents and testimony presented at trial support the bankruptcy court's finding of a willful injury. First, in connection with his loan from PNC, Nix executed a Pledge and Security Agreement, through which he pledged his interest in five membership units of Crestwood to PNC. Doc. 3-13. As the bankruptcy court noted, "[t]he world 'Pledge' in the title of the document signed by [] Nix clearly alerted him that the proceeds of the Membership Units were pledged to [PNC]" as collateral for the loan. Doc. 3-12 at 12. *See also* doc. 3-13 at 15. Second, Nix concealed PNC's security interest when he sold the units by signing documents representing to the buyers that he had not pledged any interest in the units to another entity and that he sold the units free and clear of all security interest. Docs. 3-12 at 4-5; 3-11 at 11-14. Thereafter, Nix used the proceeds to pay off other debts instead of his debt to PNC. Doc. 3-12 at 4-5. Finally, Nix never informed PNC that he sold the membership units, including when PNC inquired about the location of the stock certificates for the units. Doc. 3-11 at 15. Nix instead told PNC that he was not sure where the certificates were and that he would get back to them, which he never did. *Id.* Taken together, this

evidence supports the bankruptcy court's finding that "Nix knew his actions were substantially certain to cause injury to PNC's ability to obtain repayment of its loan . . . ." Doc. 3-12 at 14.

As for Nix's other contentions of error, the bankruptcy court in fact noted that Nix testified that he "did not understand that he pledged the Membership Units to PNC," and that "in his mind, the loan was a personal loan and there was nothing that prevented him from selling the [] Units back to the Hospital." *Id.* at 6. But, the bankruptcy court discredited his testimony, pointing out that other evidence indicates that Nix "generally knows how collateral works." *Id.* at 8, 15-16. The record supports this finding. For example, Nix testified that if Crestwood had purchased the units in 2007, he would have used the proceeds to repay PNC. *Id.* at 4. Nix also testified that he had taken out other loans secured by real property, vehicles, a boat, or office equipment, and that he understood that he would have to pay off those loans with the sales proceeds if he sold the collateral. *Id.* at 6. This testimony, along with the signed Pledge Agreement and sale documents, supports the bankruptcy court's decision to discount Nix's testimony that he never intended to deceive PNC. Consequently, the court will not disturb the bankruptcy court's credibility determination. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) ("When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands greater deference to the trial court's findings; for

only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and believe in what is said.") (citation omitted).

Finally, Nix argues that his continued payments on the loan belie a finding that he intended to injure PNC. Doc. 5 at 12-13. But, it is also true that Nix's quarterly interest payments on the loan may have been designed to prevent PNC from learning of the sale of the membership units. And, the question before the court is whether the bankruptcy court's factual finding is clearly erroneous, not whether the evidence may support an alternate finding. *See City of Bessemer City*, 470 U.S. at 573-74 ("'In applying the clearly erroneous standard to the findings of a [bankruptcy] court [], appellate courts must constantly have in mind that their function is not to decide factual issues de novo.' . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (citations omitted). Based on the foregoing, the court finds that the bankruptcy court's finding of a willful injury is not clearly erroneous.

B.  Whether the bankruptcy court erred by finding malice

Nix also argues that, in light of PNC's failure to protect its security interest in the membership units, the bankruptcy court erred by finding malice. Doc. 5 at 13. It is undisputed that PNC failed to perfect its security interest. Doc. 3-12 at 7, 13, 14-15. Also, as Nix points out, PNC knew as early as 2014, when it called Nix

9

to inquire about the stock certificates, that it did not possess the collateral for the loan. Doc. 3-11 at 15-16. Generally, "for the purposes of § 523(a)(6), 'malice can be implied,'" *In re Kane*, 755 F.3d at 1295 (quoting *In re Thomas*, 288 Fed. Appx. 547, 549 (11th Cir. 2008) (alteration in original omitted), and a creditor's failure to protect its collateral may rebut an inference of malice when the creditor "knowingly acquiesced in the [debtor's] business practices and took no steps to protect its collateral," *In re Wolfson*, 56 F.3d 52, 54-55 (11th Cir. 1995). Here, however, the bankruptcy court considered Nix's argument that PNC's failure to protect its collateral rebuts any inference of malice on his part and rejected it because (1) "a creditor's failure to perfect its security interest is irrelevant for purposes of § 523(a)(6)"[2] and (2) Nix's failure to disclose the sale of the membership units to PNC and his misrepresentations to Crestwood and the Hospital outweigh any failure by PNC to protect its collateral. Doc. 3-12 at 13-15.

The court finds no error in the bankruptcy court's conclusion. To begin, the cases Nix cites to support his argument that an inference of malice may be rebutted when a secured creditor did not take reasonable steps to protect its collateral are distinguishable. For example, in *In re Wolfson*, the Eleventh Circuit found that a creditor waived its rights to assert that a loan is non-dischargeable under § 523(a)(6) when the creditor knew that the debtor sold the collateral securing the

---

[2] *See In re Monson*, 661 Fed. Appx. 675, 684 (11th Cir. 2016) (citing *In re Garcia*, 442 B.R. 848, 851-52 (Bankr. M.D. Fla. 2011); *In re Giffen*, 195 B.R. 951, 953-54 (Bankr. M.D. Fla. 1996)).

loan, and the creditor did not object to the sale and continued to extend credit to the debtor. 56 F.3d at 54-55. It is undisputed that PNC did not know about the sale of the collateral securing the loan in this case, doc. 3-12 at 5, 7, and, therefore, could not have acquiesced in the sale. In that respect, this case is more similar to *In re McAllister*, another case Nix cites, where the bankruptcy court found that a loan was non-dischargeable under § 523(a)(6) in part because "the debtor did not present any evidence to demonstrate that [the creditor] knew or should have known that [the debtor] would wrongly retain the proceeds of the [collateral] or that [the creditor] in any sense acquiesced in or consented to his doing so." 211 B.R. 976, 984 (Bankr. N.D. Ala. 1997).[3]

Moreover, as the bankruptcy court noted, the Eleventh Circuit has held that "'whether or not a lienholder's security interest is properly perfected or recorded, where the debtor has knowledge of the lienholder's claim and subsequently sells or disposes of the property at issue without notice to the lienholder, that act constitutes a willful and malicious injury under § 523(a)(6).'" Doc. 3-12 at 13 (quoting *In re Monson*, 661 Fed. Appx. at 685). Nix's contention that *In re*

---

[3] The other case Nix cites, *In re Lovvorn*, 430 B.R. 318 (Bankr. M.D. Ga. 2010), is also not helpful. The debtor in *In re Lovvorn* made timely payments under the terms of the applicable note, but the creditor still made a demand for an additional $10,000 payment, and withdrew his demand in exchange for a security interest in one of the debtor's cars. *Id.* at 328. In other words, as the bankruptcy court found, "the parties entered into an arrangement whereby [the debtor] agreed to repay money that was never actually loaned by [the creditor]." *Id.* at 328-29. That is simply not the case here where Nix admits PNC loaned him the funds. Moreover, unlike in this case, the security agreement at issue in *In re Lovvorn* "made no mention of proceeds from the sale of collateral." *Id.* at 329.

*Monson* is distinguishable because he "did not act in a way that was calculated to deprive PNC of its interest in the Units," and PNC did not demand the return of its collateral is unavailing. Doc. 5 at 16. As discussed above, the evidence supports the bankruptcy court's finding that Nix acted in a way that was designed to injure PNC. *See* pp. 7-9, *supra*. In addition, PNC's failure to demand the return of the collateral is not dispositive because PNC did not know that Nix had sold or planned to sell his membership units. As a result, the bankruptcy court did not err by finding that PNC's failure to perfect its security interest did not rebut an inference of malice. Doc. 3-12 at 14-15.

    C.    <u>Whether Nix is entitled to a new trial based on the missing transcript</u>

Finally, Nix argues that the lack of a trial transcript for the adversary proceeding due to a technical glitch disadvantages him significantly in this appeal. *See* docs. 3-10 at 3; 5 at 7, n.1, 12, n.2, 18. In his reply brief, Nix also argues that the missing transcript prevents the court from viewing the entire record and warrants a remand for a new trial. Doc. 7 at 4-8. For its part, PNC asks the court to strike Nix's reply brief in part because it raises new arguments. Doc. 8 at 1. Indeed, even though Nix raised the issue of the missing transcript in his initial brief, he did not argue that the omission entitles him to a new trial. Doc. 5. Thus, the arguments for a new trial are not properly before the court. *See Herring v. Sec'y, Dept. of Corr.*, 397 F.3d 133, (11th Cir. 2005) ("'[A]rguments raised for the

12

first time in a reply brief are not properly before a reviewing court.'") (quotation omitted).

Moreover, the failure to transcribe a court proceeding "may constitute adequate grounds for reversal and the ordering of a new trial" in some circumstances, but it "is not reversible error per se." *Calhoun v. United States*, 384 F.2d 180, 184 (5th Cir. 1967). A case on this issue that is persuasive is *Bergerco, U.S.A. v. Shipping Corp. of India, Ltd.*, 896 F.2d 1210, 1215 (9th Cir. 1990), where the court held that an appellant seeking a new trial in a civil case based on "a missing or incomplete transcript must 1) make a specific allegation of error; 2) show that the defect in the record materially affects the ability of the appeals court to review the alleged error; and 3) show that a Rule 10(c) proceeding has failed or would fail to produce an adequate substitute for the evidence." 896 F.2d at 1217. Under Rule 10(c) of the Federal Rules of Appellate Procedure and the analogous bankruptcy rule:

> If the transcript of a hearing or trial is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement must be served on the appellee, who may serve objections or proposed amendments within 14 days after being served.

Fed. R. App. P. 10(c); Fed. R. Bankr. P. 8009(c). The Ninth Circuit recognized that only "in rare circumstances" would the procedures set forth in Rule 10(c) be inadequate, and, therefore, a retrial based on a missing trial transcript is appropriate

13

only in "rare cases." *Bergerco*, 896 F.2d at 1217.

Turning to the specifics here, Nix asserts that his testimony at trial proves that his actions do not amount to a willful and malicious injury under § 523(a)(6) and that "the sales and payments corresponded to the payment terms of the promissory note . . . ." Doc. 7 at 4, 6. Nix contends that the court must review the trial testimony to adequately consider his appeal. *Id.* To the contrary, pursuant to Rule 8009(c), Nix prepared a statement of the evidence, which fully allows this court to consider this appeal. The statement includes Nix's contentions that he did not intend to injure PNC, that he considered the loan to be a personal loan, and that he continued to make quarterly payments until July 2016. Doc. 3-10 at 3-5. The findings of fact in the bankruptcy court's opinion are consistent with Nix's statement. *See* doc. 3-12 at 2-8. Indeed, the bankruptcy court recounts that Nix testified "that he never intended to deceive PNC" and that "in his mind, the loan was a personal loan and there was nothing that prevented him from selling the Membership Units back to the Hospital." Doc. 3-12 at 6, 8. The bankruptcy court also notes that Nix made quarterly interest payments until July 2016. *Id.* at 3, 8, 12, 14, 16. Critically, Nix does not contend that the bankruptcy court mischaracterized his testimony or made an error in recounting any of the trial testimony, nor does he assert that the bankruptcy court failed to consider specific material testimony. *See* docs. 5, 7, 9. Therefore, that Nix disagrees with the

14

conclusions the bankruptcy court drew from his testimony is not sufficient to show that this court cannot adequately review the record without the trial transcript.

Moreover, Nix does not explain why the Rule 8009(c) procedure is inadequate, other than to generally assert that a statement recreating a witness's "entire trial testimony will presumably be inaccurate as the parties' recollections will differ and be marred by the passage of time." Doc. 7 at 6-7. Here, however, the court is concerned only about Nix's recollection of the testimony. As stated previously, Nix does not allege that the bankruptcy court mischaracterized his or any other testimony. Consequently, Nix's vague contention about a possibility of inaccuracies is not sufficient to show that there is an inaccuracy in the bankruptcy court's summary of the trial testimony, or that the parties' statements of the evidence are inadequate. In short, Nix has not shown that the court cannot fairly rule on his appeal based on the record before it, or that he is entitled to a new trial in light of the missing trial transcript.

## III. <u>CONCLUSION</u>

For all of these reasons, the bankruptcy court's order is due to be affirmed, and PNC's motion to strike is moot. A separate order will be entered.

**DONE** the 5th day of February, 2019.

                                        **ABDUL K. KALLON**
                                   UNITED STATES DISTRICT JUDGE